David R. Spiegel (N.Y. Bar # 1592724)
Lawrence Hodapp (D.C. Bar # 221309)
James H. Davis (Wis. Bar #1029809)
Federal Trade Commission
600 Pennsylvania Ave., NW
Washington, DC 20580
(202) 326-3281, fax (202) 326-3395
Attorneys for Plaintiff

JAMES W. JENNINGS, JR.
Assistant United States Attorney
601 N.W. Loop 410, Suite 600
San Antonio, Texas 78216
Tel. (210) 384-7330
Fax (210) 384-7322
Texas Bar No. 10641400
Local Counsel

FILED

JUL 0 7 2003

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS, WACO DIVISION

| | |
|---|---|
| Federal Trade Commission, | ) |
| | ) |
| | ) |
| Plaintiff, | ) **Civ. No.** |
| | ) |
| v. | ) |
| | ) |
| Electronic Financial Group, Inc., | ) |
| | ) **COMPLAINT FOR INJUNCTIVE** |
| EFG Card Services, Inc., | ) **AND OTHER EQUITABLE RELIEF** |
| | ) |
| Paul McClinton, | ) |
|     individually and as an officer of | ) |
|     Electronic Financial Group, Inc. and | ) |
|     EFG Card Services, Inc. | ) |
| | ) |
| Jerry Federico, | ) |
|     individually and as an officer of | ) |
|     Electronic Financial Group, Inc. and | ) |
|     EFG Card Services, Inc. and | ) |
| | ) |
| Randy Balusek, | ) |
|     individually and as an officer of | ) |
|     Electronic Financial Group, Inc. | ) |
| | ) |
| | ) |
| Defendants. | ) |
| | ) |

WO3CA211

\

Plaintiff Federal Trade Commission ("FTC" or "Commission") for its complaint alleges:

1.    The FTC brings this action under Sections 13(b) and 19 of the Federal Trade Commission

Act ("FTC Act"), 15 U.S.C. §§ 53(b) and 57b, and the Telemarketing and Consumer Fraud

and Abuse Prevention Act ("Telemarketing Act"), 15 U.S.C. §§ 6101 et seq., to obtain

preliminary and permanent injunctive relief, rescission of contracts, restitution, redress,

disgorgement, and other equitable relief for defendants' deceptive and unfair acts or practices

in violation of Section 5 of the FTC Act, 15 U.S.C.§ 45, and the FTC's Trade Regulation

Rule, entitled "Telemarketing Sales Rule," 16 C.F.R. Part 310.

## JURISDICTION AND VENUE

2.    Subject matter jurisdiction is conferred upon this Court by 15 U.S.C. §§ 45(a), 53(b), 57b,

6102(c), and 6105(b), and 28 U.S.C. §§ 1331, 1337(a), and 1345.

3.    Venue in this District is proper under 15 U.S.C. §§ 53(b) and 28 U.S.C. § 1391(b) and (c).

## PLAINTIFF

4.    Plaintiff, the FTC, is an independent agency of the United States Government created by

statute. 15 U.S.C. §§ 41 et seq.  The Commission is charged, inter alia, with enforcing

Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or

practices in or affecting commerce.  The Commission also enforces the Telemarketing Sales

Rule, 16 C.F.R. Part 310, which prohibits deceptive or abusive telemarketing practices.

5.    Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), authorizes the FTC to initiate federal

district court proceedings, in its own name by its designated attorneys, to enjoin violations

of any provision of law enforced by the FTC, and to secure such equitable relief as may be

appropriate in each case, including redress, restitution and disgorgement. 15 U.S.C. §§ 53(b), 57b, 6102(c), and 6105(b).

## DEFENDANTS

6.    Defendant Electronic Financial Group, Inc. ("EFG"), is a Texas corporation with its principal place of business located at 4800 West Waco Drive, Waco, Texas. EFG provides marketing, customer service, Automated Clearing House ("ACH") processing services, and other management services that direct, control, assist or facilitate the acts and practices described in the complaint. EFG sometimes also does or has done business as AmeriOne, First Freedom Financial and First Freedom Group. EFG has transacted business within the Western District of Texas and throughout the United States.

7.    Defendant EFG Card Services, Inc. ("Card Services"), is a Texas corporation with its principal place of business located at 801 Washington Avenue, Suite 800, Waco, Texas. Card Services provides accounting or other management services that direct, control, assist or facilitate the acts and practices described in the complaint. Card Services has transacted business within the Western District of Texas and throughout the United States.

8.    Defendant Paul F. McClinton is the Chief Executive Officer of EFG and an officer of Card Services. He formulates, directs, controls, and/or participates in the acts or practices set forth in the complaint. He is a resident of Texas and transacts or has transacted business in the Western District of Texas and throughout the United States.

9.    Defendant Jerry Federico is the president of EFG and an officer of Card Services. He formulates, directs, controls, and/or participates in the acts or practices set forth in the complaint. He is a resident of Texas and transacts or has transacted business in the Western

District of Texas and throughout the United States.

10.     Defendant Randy Balusek is the Chief Operating Officer of EFG.  He formulates, directs, controls, and/or participates in the acts or practices set forth in the complaint.  He is a resident of Texas and transacts or has transacted business in the Western District of Texas and throughout the United States.

## COMMERCE

11.     At all times material to this complaint, defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## DEFENDANTS' ACH PROCESSING BUSINESS PRACTICES

### *The ACH Network and NACHA*

12.     Since at least 1997, EFG has processed transactions into the ACH Network on behalf of merchants, including numerous telemarketers who make unsolicited calls to consumers for the purpose of selling goods and services ("outbound telemarketers").  The ACH Network is a nationwide electronic funds transfer system that provides for the interbank clearing of electronic payments.  In some cases, EFG's clients are the telemarketing companies themselves, with whom EFG enters into a direct contractual agreement to provide ACH services.  In other cases, EFG's clients are other ACH processors, who in turn have a contractual relationship with the telemarketers.

13.     NACHA -- The Electronic Payments Association ("NACHA") is a not-for-profit trade association that develops and enforces rules for the ACH Network ("NACHA Rules").  The NACHA Rules specifically prohibit, among other things, the processing of one-time,

telephone-authorized ACH transactions on behalf of merchants engaged in outbound telemarketing to consumers with whom such merchants have no existing relationship. This Rule, known as the "TEL Rule," was designed to reduce the risk of telemarketing fraud on consumers by prohibiting the processing of one-time, telephone-authorized transactions on behalf of merchants who initiate telemarketing calls to consumers with whom such merchants have no existing relationship.

14.     To process electronic payments through the ACH Network, EFG entered into a contract with the First National Bank of Central Texas, in which EFG agreed to comply with the NACHA Rules. However, since at least 1997, EFG has knowingly processed on behalf of merchants engaged in outbound telemarketing to consumers with whom such merchants have no existing relationship, in direct violation of the NACHA Rules and EFG's agreement with the First National Bank of Central Texas.

15.     The ACH Network enables various participants in an ACH transaction to return debit or credit transactions for certain specified reasons. NACHA and other ACH Network participants have historically advocated the monitoring of return rates as a risk management procedure. Since at least 1997, defendants have knowingly processed ACH transactions on behalf of companies with return rates well in excess of industry risk benchmarks.

### ACH Processing on Behalf of Deceptive Telemarketers

16.     Since at least 1997, defendants have processed electronic debits to consumers' bank accounts through the ACH Network on behalf of numerous deceptive telemarketing schemes, at least four of which have been the subject of FTC law enforcement actions. These deceptive telemarketing schemes include, but are not limited to:

A.     FTC v. 1263523 Ontario, Inc., No. 99 CV 8679 (S.D.N.Y., Filed Aug. 5, 1999);

B.     FTC v. B.B.M. Investments, Inc., No. C00-00627 (W.D. Tex., Filed Jan. 13, 2000);

C.     FTC v. Assail, Inc., No. W03CA007 (W.D. Tex., Filed Jan. 7, 2003); and

D.     FTC v. Corporate Marketing Solutions, Inc., No. CIV-02 1256 PHX RCB (D. Ariz., Filed July 8, 2002).

17.   In processing ACH transactions on behalf of the parties named in the cases referenced above in Paragraph 16 and on behalf of other deceptive telemarketers, defendants caused tens of millions of dollars to be electronically withdrawn from the bank accounts of consumers.

18.   On November 13, 1997, EFG executed a contract with Lloyd Prudenza, David Wells and 1263523 Ontario, Inc., a Canadian company, d/b/a Consumer Credit Services, for the provision of ACH processing services.

19.   During the time EFG processed ACH transactions for Consumer Credit Services, defendants knew or consciously avoided knowing that Consumer Credit Services: (1) engaged in outbound telemarketing; (2) deceptively marketed bogus credit cards in exchange for an advance fee; and (3) generated return rates in excess of 60%.

20.   On August 5, 1999, the FTC sued 1263523 Ontario, Inc. and its principals, for violations of the FTC Act and the Telemarketing Sales Rule (FTC v. 1263523 Ontario, Inc., No. 99 CV 8679 (S.D.N.Y., 1999)).  A final order was entered in 1263523 Ontario on September 21, 2001.

21.   On June 20, 1997, EFG executed a contract with Lottonet International, Ltd., a Canadian company, and the director of Lottonet, Donald Hufnagel, for the provision of ACH processing services.

22.   During the time EFG processed ACH transactions for Lottonet, defendants knew or
      consciously avoided knowing that Lottonet: (1) engaged in outbound telemarketing;
      (2) deceptively marketed bogus Australian lottery tickets and British bonds; and
      (3) generated return rates in excess of 40%.

23.   On January 13, 2000, the FTC sued Lottonet and its principals for violations of the FTC Act
      and the Telemarketing Sales Rule (FTC v. B.B.M. Investments, Inc., No. C00-00627 (W.D.
      Wa. 2000)).  A final order was entered in B.B.M. Investments on June 4, 2001.

24.   In or around September 2001, EFG began processing ACH transactions for clients of
      Global eTelecom, Inc. ("Global").  One of these clients of Global was a group of corporate
      entities known as the "Assail Companies."

25.   During the time EFG processed for the Assail Companies, defendants knew or consciously
      avoided knowing that the Assail Companies: (1) engaged in outbound telemarketing;
      (2) deceptively marketed bogus credit cards in exchange for an advance fee; and (3)
      generated return rates in excess of 60%.

26.   On January 7, 2003, the FTC sued the Assail Companies and their principals for violations
      of the FTC Act and the Telemarketing Sales Rule (FTC v. Assail, Inc., No. W03CA007
      (W.D. Tex. 2003).

27.   In or around December 2001, EFG began processing ACH transactions for clients of ACH
      Commerce, LLC, knowing that many of these clients were engaged in outbound
      telemarketing.  One of the clients of ACH Commerce was a group of entities known as
      Corporate Marketing Solutions, Inc.

28.   During the time EFG processed for Corporate Marketing Solutions, defendants knew or

consciously avoided knowing that Corporate Marketing Solutions and its related entities:
(1) engaged in outbound telemarketing; (2) deceptively marketed bogus credit cards in
exchange for an advance fee; and (3) generated return rates in excess of 70%.

29.    On July 8, 2002, the FTC sued Corporate Marketing Solutions, its principals and related
entities for violations of the FTC Act and the Telemarketing Sales Rule (FTC v. Corporate
Marketing Solutions, Inc., No. CIV-02 1256 PHX RCB (D. Ariz. 2002)).  A final order was
entered in Corporate Marketing Solutions on February 6, 2003.

## DEFENDANTS' MARKETING OF ADVANCE-FEE DEBIT CARDS

30.    In or around April 2000 and continuing to the present, defendants have conceived and
organized the sale of advance-fee debit cards of their own, including, but not limited to, the
First Freedom Financial card and the AmeriOne card.  Working with third-party marketing
agents, defendants promoted these products, electronically debited the bank accounts of
consumers who purchased the products, and provided related customer service.

### *First Freedom Financial Card*

31.    In or around April 2000, defendants began marketing and providing ACH processing and
related customer service for an advance-fee debit card product known as the First Freedom
Financial Visa card ("First Freedom card").  Using third-party telemarketers, EFG typically
sold the First Freedom card to consumers with poor credit records who could not qualify for
a conventional credit card.

32.    Defendants reviewed, edited and approved the sales scripts used by First Freedom
telemarketers.  Among other things, these scripts stated or implied that consumers would
receive a credit card with 0% interest and a credit limit up to $7500.

33.     In or around June 2000, defendants began receiving complaints from consumers regarding the deceptive marketing of the First Freedom card as a credit card. Despite this knowledge, defendants continued allowing the card to be telemarketed, and continued electronically debiting the bank accounts of consumers who applied for the First Freedom card.

34.     In or around December 2000, defendants executed a marketing agreement with Millennium Sales, Inc., permitting Millennium to telemarket two "benefits packages" that each included an application for the First Freedom card. The agreement further provided that EFG would electronically withdraw a one-time membership fee of $99 to $129 as well as a recurrent $9.95 monthly maintenance fee from the bank accounts of consumers who applied for the Millennium benefits packages.

35.     Defendants reviewed and approved outbound telemarketing sales scripts for Millennium's benefit club products. Among other things, these scripts stated or implied that consumers would receive a credit card with 0% interest and a credit limit up to $7500. At least one of these scripts stated or implied that consumers would receive help repairing or establishing credit.

36.     During the marketing of the First Freedom card, defendants operated a customer service call center at the EFG corporate office in Waco, Texas, where EFG employees answered telephone calls and email regarding the First Freedom card and Millennium benefits packages.

37.     In or around March 2001, defendants became aware of a large volume of consumer complaints resulting from the deceptive marketing of the First Freedom card as a credit card. Despite this knowledge, defendants continued allowing Millennium to telemarket the First

Freedom card, and continued electronically debiting the bank accounts of consumers who applied for the card and for the Millennium benefits packages.

38. On November 14, 2001, the FTC sued Millennium, its principals, and related corporate entities for violations of the FTC Act and the Telemarketing Sales Rule (<u>FTC v. 1st Financial Solutions, Inc.</u>, No. 01C8790 (N.D. Ill. 2001)). A final judgment was entered in <u>1st Financial Solutions</u> on September 25, 2002.

### The AmeriOne Card

39. From about November 2001 to about February 2003, defendants marketed an advance-fee debit card known as the AmeriOne MasterCard over the Internet.

40. The AmeriOne card is not a credit card. Defendants do not extend any credit to AmeriOne cardholders. Therefore, the AmeriOne card has no credit limit, credit line, interest fees or annual percentage rate. Instead, each card has a "stored value" that is purportedly a function of how much money cardholders deposit with EFG, generally in the form of automatic monthly ACH bank transfers processed by EFG. Any purchases made using the card are deducted from this available balance. In AmeriOne promotional materials, defendants claim that the AmeriOne card can be used anywhere in the U.S. that MasterCard is accepted. There are one-time fees between $80 and $100 for the AmeriOne card as well as an ongoing monthly maintenance fee of $9.95, all of which are withdrawn electronically from consumers' bank accounts by EFG via the ACH network.

41. Defendants create, review and approve of AmeriOne marketing materials and have enlisted a vast network of affiliates to sell the AmeriOne card over the Internet. AmeriOne is advertised on credit card, credit repair and other credit-related Internet websites as well as

in mass, unsolicited email.

42.   The email, websites, and banner ads used by defendants to promote AmeriOne all link to an official AmeriOne homepage where consumers can apply for the AmeriOne card using an online application form.  Applicants are required to provide their bank routing and account numbers, which are used by defendants to electronically withdraw fees from consumers' bank accounts.

43.   Defendants operate a customer service call center for AmeriOne cardholders at the EFG corporate office in Waco, Texas.  Call center employees answer telephone calls and email regarding the AmeriOne card.

44.   Defendants' advertisements for the AmeriOne card frequently stated or implied that AmeriOne was a credit card by asserting that AmeriOne had "0% interest" and a "limit up to $7500." AmeriOne advertisements frequently did not explain that AmeriOne is a debit card or hid such disclosures in fine print.  Defendants also frequently stated that AmeriOne is a "secured card" or claimed that it has a "credit limit" or "credit line."

45.   In AmeriOne promotional materials and in email and telephone communications with consumers, defendants claim that they report consumers' AmeriOne account history on a monthly basis to "the three major credit bureaus," thereby improving consumers' credit ratings. In fact, none of the three major credit bureaus has accepted or posted data submitted by EFG regarding consumers' AmeriOne account history.

46.   In their advertisements, defendants also induce consumers to apply for the AmeriOne card and to disclose their personal financial information, using the pretext that AmeriOne is affiliated with the MasterCard brand logo. In fact, no such affiliation or relationship exists.

47.     As a result of telephone calls and email handled by EFG customer service representatives,

direct contact with consumers, and direct participation in the fraudulent practices described

herein, defendants have been aware since the inception of the AmeriOne program of

numerous consumer complaints regarding:

A.      defendants' failure to report, as promised, to the three major credit bureaus;

B.      misleading AmeriOne advertisements that cause consumers to believe that AmeriOne

is a credit card;

C.      unauthorized electronic withdrawals from bank accounts of consumers who did not

apply for the AmeriOne card, did not complete the online application, or tried

unsuccessfully and repeatedly to cancel their card; and

D.      defendants' failure to deliver the AmeriOne card to consumers who have paid all the

required fees, including ongoing monthly maintenance fees.

48.     Consumers who attempt to cancel their AmeriOne cards by contacting the EFG call center

are frequently unable to do so because of constant busy signals, a backlog of unprocessed

cancellation requests, and other negligent management practices.    Consumer injury

associated with this delay is compounded by EFG's refund policy, which prohibits

cardholders from receiving a full refund unless such a request is made within 5 calendar days

-- including Saturdays, Sundays and holidays -- from the date on which EFG debited their

bank account.

49.     Defendants routinely withdraw funds from the bank accounts of consumers who start and

then either abandon or attempt to cancel the online AmeriOne application by selecting an

option clearly marked "cancel."   Using personal financial information from partially

completed applications, EFG electronically withdraws the membership and maintenance fees from bank accounts of consumers who neither submitted a complete application nor authorized EFG to debit their accounts.

## THE FTC'S TELEMARKETING SALES RULE

50.     In the Telemarketing Act, 15 U.S.C. §§6101-6108, Congress directed the FTC to prescribe rules prohibiting abusive and deceptive telemarketing acts practices. On August 16, 1995 the FTC promulgated the TSR, 16 C.F.R. Part 310. The TSR became effective on December 31, 1995. On December 18, 2002, the FTC promulgated amendments to the TSR. The FTC's amendments became effective on March 31, 2003.

51.     The Telemarketing Sales Rule prohibits telemarketers and sellers from "making a false or misleading statement to induce any person to pay for goods or services." 16 C.F.R. § 310.3(a)(4).

52.     The Telemarketing Sales Rule also prohibits telemarketers and sellers from, among other things, requesting or receiving payment of any fee or consideration in advance of obtaining a loan or other extension of credit when the seller or telemarketer has guaranteed or represented a high likelihood of success in obtaining or arranging a loan or other extension of credit. 16 C.F.R. § 310.4(a)(4).

53.     The Telemarketing Sales Rule also prohibits telemarketers and sellers from requesting or receiving payment of any fee or consideration for goods or services represented to remove derogatory information from, or improve, a person's credit history, credit record, or credit rating until (1) the time frame in which the seller has represented all of the goods or services

will be provided to that person has expired and (2) the seller has provided the person with documentation in the form of a consumer report from a consumer reporting agency demonstrating that the promised results have been achieved. 16 C.F.R. § 310.4(a)(2).

54.    The Telemarketing Sales Rule also prohibits a person from providing "substantial assistance or support" to any seller or telemarketer when that person "knows or consciously avoids knowing" that the telemarketer is engaged in acts or practices that violate 16 C.F.R. §§ 310.3(a), or § 310.4 of the Rule. 16 C.F.R. § 310.3(b).

55.    Pursuant to Section 3(c) of the Telemarketing Act, 15 U.S.C. § 6102(c), and Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), violations of the Telemarketing Sales Rule constitute unfair or deceptive acts or practices in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

56.    Defendants are "persons" and "sellers" as these terms are defined in Sections 310.2(o) and (r) of the 1995 Rule, renumbered but unchanged as Sections 310.2(v) and (z) of the 2003 Rule.

57.    Defendants have processed ACH transactions and provided related customer service on behalf of persons who are "sellers" or "telemarketers" engaged in "telemarketing," as those terms are defined in Sections 310.2(r), (t), and (u) of the 1995 Rule, renumbered but unchanged as Sections 310.2(z), (bb), and (cc) of the 2003 Rule..

### VIOLATION OF THE TELEMARKETING SALES RULE

### COUNT I

*Assisting and Facilitating Telemarketing Sales Rule Violations*

58.    In numerous instances, defendants have processed ACH transactions and provided related

customer service on behalf of telemarketers who:

A.    induced consumers to pay for goods and services through the use of false or misleading statements in violation of Section 310.3(a)(4) of the Telemarketing Sales Rule;

B.    falsely represented that after paying an advance fee, consumers are guaranteed or highly likely to receive a credit card or obtain a loan in violation of Section 310.4(a)(4) of the Telemarketing Sales Rule; and

C.    requested or received an advance fee or other consideration for goods or services represented to improve a person's credit history, credit record or credit rating in violation of Section 310.4(a)(2) of the Telemarketing Sales Rule.

59.    Defendants knew or consciously avoided knowing of the illicit practices alleged in Paragraph 58 and have therefore provided substantial assistance and support to deceptive telemarketers in violation of Section 310.3(b) of the Telemarketing Sales Rule.

## VIOLATIONS OF SECTION 5 OF THE FTC ACT

60.    Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "deceptive" or "unfair" acts and practices in or affecting commerce. Misrepresentations or omissions of material fact constitute deceptive acts or practices pursuant to Section 5(a) of the FTC Act. Under Section 5(n) of the FTC Act, an act or practice is unfair if it causes or is likely to cause substantial injury to consumers that is not reasonably avoidable by consumers and is not outweighed by countervailing benefits to consumers or competition. 15 U.S.C. § 45(n).

## COUNT II

### *Deceptive Marketing of Advance-Fee Debit Cards*

61.    In numerous instances, in connection with the marketing and provision of related customer service for advance-fee debit cards, including the AmeriOne and First Freedom cards, defendants represent, expressly or by implication:

    A.    that such cards are credit cards;

    B.    that the AmeriOne card is affiliated with the MasterCard brand logo; and/or

    C.    that defendants report information related to consumers' AmeriOne accounts to the three major credit bureaus, thereby improving or repairing consumers' credit ratings;

62.    In truth and in fact:

    A.    defendants' advance-fee debit cards, including the AmeriOne and First Freedom cards, are not credit cards;

    B.    the AmeriOne card is not affiliated with the MasterCard brand logo; and

    C.    defendants do not regularly report information related to consumers' AmeriOne accounts to the three major credit bureaus, and do not thereby improve or repair consumers' credit ratings.

63.    Therefore, the representations set forth in Paragraph 61 are false and misleading and constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT III

### *Unauthorized Charging of Consumers*

64.    In numerous instances, in connection with the marketing of the AmeriOne card and the

provision of ACH processing services for the AmeriOne card, defendants have caused consumers' bank accounts to be electronically debited:

A.    without having previously obtained the consumers' authorization for such debits;

B.    prior to the expiration of any cancellation period;

C.    after consumers have asked to cancel their purchase of the AmeriOne card; or

D.    after consumers were denied the ability to cancel their AmeriOne card through the customer service phone number and email address provided by defendants.

65.    Defendants' practices as set forth in Paragraph 64 cause or are likely to cause substantial injury to consumers that is not reasonably avoidable by consumers and is not outweighed by countervailing benefits to consumers or competition.

66.    Defendants' practices as alleged in Paragraphs 64 and 65 are unfair practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

*Breach of Contract*

**COUNT IV**

67.    EFG, in its contract with the First National Bank of Central Texas, promised that in processing electronic debits to consumers' bank accounts through the ACH Network on behalf of its clients, it would comply with the NACHA Rules, including the NACHA TEL Rule, which was designed to reduce the risk of telemarketing fraud on consumers by prohibiting the processing of one-time, telephone-authorized transactions on behalf of merchants who initiate telemarketing calls to consumers with whom such merchants have no existing relationship.

68.    In truth in and in fact, EFG breached its contract to abide by the NACHA Rules, by

processing one-time, telephone-authorized electronic debits to consumers' bank accounts through the ACH Network on behalf of merchants who initiate telemarketing calls to consumers with whom such merchants have no existing relationship.

69.   EFG's contractual promise to comply with the NACHA Rules, and its subsequent systematic breach of that promise by processing on behalf of outbound telemarketers engaged in deceptive marketing practices, as set forth in Paragraphs 67 and 68, caused the debiting of the bank accounts of a large number of consumers who either never authorized the telemarketers to debit their accounts, or only authorized debits based on the telemarketers' deceptive practices.   Adherence to the contractual promise to comply with the TEL Rule would have prevented these results.   In addition, these consumers' banks also have incurred substantial economic harm as a result of processing a substantial increase in requests by consumers seeking refunds for unauthorized charges.   These increased customer servicing costs in turn get passed on to consumers in the form of higher fees for basic checking account products.

70.   EFG's false contractual promise, and systematic breach of that contractual promise, therefore caused and is likely to cause substantial injury to consumers that is not reasonably avoidable by consumers and not outweighed by countervailing benefits to consumers or competition.

71.   Defendants' practices as alleged in Paragraphs 67-70 are unfair practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## CONSUMER INJURY

72.   Consumers throughout the United States have suffered, and continue to suffer, substantial monetary loss as a result of defendants' unlawful acts or practices.   In addition, defendants

have been unjustly enriched as a result of their unlawful practices. Absent injunctive relief by this Court, defendants are likely to continue to injure consumers, reap unjust enrichment, and harm the public interest.

## THIS COURT'S POWER TO GRANT RELIEF

73.     Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and other ancillary equitable relief, including consumer redress, disgorgement, and restitution, to prevent and remedy violations of any provision of law enforced by the Commission.

74.     Section 19 of the FTC Act, 15 U.S.C. § 57b, and Section 6(b) of the Telemarketing Act, 15 U.S.C. § 6105(b), authorize this Court to grant such relief as the Court finds necessary to redress injury to consumers or other persons resulting from defendants' violations of the Telemarketing Sales Rule, including the rescission and reformation of contracts and the refund of monies.

75.     This Court, in the exercise of its equitable jurisdiction, may award other ancillary relief to remedy injury caused by defendants' law violations.

## PRAYER FOR RELIEF

76.     WHEREFORE, plaintiff, the Federal Trade Commission, pursuant to Sections 13(b) and 19 of the FTC Act, 15 U.S.C. §§ 53(b) and 57b, Section 6(b) of the Telemarketing Act, 15 U.S.C. § 6105(b), and the Court's own equitable powers, requests that the Court:

A.      Award plaintiff such preliminary injunctive and ancillary relief as may be necessary to avert the likelihood of consumer injury during the pendency of this action, and to preserve the possibility of effective final relief;

B.      Permanently enjoin defendants from violating the FTC Act and the Telemarketing

Sales Rule, as alleged herein;

C.      Award such relief as the Court finds necessary to redress injury to consumers

resulting from defendants' violations of the FTC Act and the Telemarketing Sales

Rule, including, but not limited to, rescission of contracts, the refund of monies paid,

and the disgorgement of ill-gotten monies; and

D.      Award plaintiff the costs of bringing this action, as well as such other and additional

equitable relief as the Court may determine to be just and proper.


Dated: July 7, 2003                         William E. Kovacic
                                            General Counsel


                                            David R. Spiegel (N.Y. Bar # 1592724)
                                            Lawrence Hodapp (D.C. Bar #  221309)
                                            James H. Davis (Wis. Bar #1029809)
                                            Federal Trade Commission
                                            600 Pennsylvania Avenue, N.W.
                                            Room H-238
                                            Washington, D.C.  20580
                                            Phone: (202)326-3281; (202) 326-3211
                                            Fax: (202)326-3395


                                            James W. Jennings, Jr.
                                            Assistant United States Attorney
                                            601 N.W. Loop 410, Suite 600
                                            San Antonio, Texas 78216
                                            Tel. (210) 384-7330
                                            Fax (210) 384-7322
                                            Texas Bar No. 10641400